1  JoAnn Jett Corson
   Registered Diplomate Reporter
2  Certified Realtime Reporter
   P. O. Box 8006
3  Missoula, Montana 59807-8006
   406/829-7123 office
4  joann_corson@mtd.uscourts.gov

5  United States Court Reporter

6

7

8

9              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MONTANA
10                      MISSOULA DIVISION

11  UNITED STATES OF AMERICA,      )
                         Plaintiff,)  No. CR 20-32-M-DWM
12       vs.                       )
                                   )  **TRANSCRIPT OF**
13  MATTHEW ANTHONY MARSHALL,      )  **HEARING ON MOTIONS**
                        Defendant.)
14  _____)

15

16        **BEFORE THE HONORABLE DONALD W. MOLLOY**
            **UNITED STATES DISTRICT COURT JUDGE**
17            **FOR THE DISTRICT OF MONTANA**

18

            Russell Smith United States Courthouse
19                   201 East Broadway
                 Missoula, Montana 59802
20              Wednesday, February 3, 2021
                  09:01:02 to 09:52:00
21

22

23

24

            Proceedings recorded by machine shorthand
25    Transcript produced by computer-assisted transcription

1                              **APPEARANCES**

2    For the Plaintiff:            MR. TIMOTHY J. RACICOT
                                   MR. RYAN G. WELDON
3                                  Assistants U.S. Attorney
                                   P.O. Box 8329
4                                  Missoula, Montana 59807

5    For the Defendant:            MR. TIMOTHY M. BECHTOLD
                                   Attorney at Law
6                                  P.O. Box 7051
                                   Missoula, Montana 59807-7051

7

8

9                              **CONTENTS**

10   Proceedings ...........................................    3

11   Argument by Mr. Racicot ................................    3

12   Argument by Mr. Bechtold ...............................   20

13   Rebuttal Argument by Mr. Racicot ......................   32

14   Reporter's Certificate ................................   35

15

16

17

18

19

20

21

22

23

24          REPORTER'S NOTE:   "Uh-huh" and "Um-hmm" indicate
     affirmative responses.   "Huh-uh" and "Hm-umm" indicate
25   negative responses.

                             PROCEEDINGS

 1

 2       (Open court.)

 3       (Defendant present.)

 4            THE COURT:  Good morning.  Please be seated.

 5            Would you call the first matter on the calendar,

 6  please?

 7            THE CLERK:  This is the time set for a motion

 8  hearing in Case No. CR 20-32-M-DWM, *United States of America*

 9  *v. Matthew Anthony Marshall.*

10            THE COURT:  Good morning, Mr. Racicot.

11            MR. RACICOT:  Good morning, Your Honor.

12            THE COURT:  I think you have four motions *in limine*,

13  and the podium is yours.

14            MR. RACICOT:  Thank you, Your Honor.

15            THE COURT:  And if it's okay with you, while you're

16  at the podium you can take that mask off.

17            MR. RACICOT:  Thank you, Your Honor.  I would

18  appreciate that.

19            Thank you, Judge.  We appreciate you setting this

20  hearing.  You know, I've had more cases with you than I can

21  probably count, and I don't know if I've ever filed a motion

22  *in limine* like this in a case before you.  I might have filed

23  a handful of motions *in limine* over the years, but they're not

24  something that I regularly do.

25            The first and primary point that we want to make

1    this morning is that we understand very well that Mr. Marshall

2    is entitled to put on a defense.  We really don't want to

3    stand in the way of that, and we know that his defense is

4    gonna include going after the credibility of witnesses and

5    primarily going after the credibility of the victim who is

6    going to be a key witness, not the only key witness but a key

7    witness.

8         But our point in filing the motion was we don't

9    think that those rules of evidence are thrown out the window

10   just because the defendant does get to put on his defense, and

11   we mainly wanted to put the Court on notice that there are so

12   many issues that swirl around the victim in this case and that

13   swirl around this case in particular and Mr. Marshall's

14   relationship with the victim that, if he's allowed to go all

15   of the different places that we anticipate he might want to,

16   it could very well lead to significant 403 issues.

17        But it could also be just confusing for the jury, it

18   could take an inordinate amount of the Court's and the jury's

19   time, and it could be confusing for them and just basically

20   lead to places where we don't think the Court needs to go and,

21   more than that, even, require us to at least ask the Court to

22   allow us to put on a pretty robust rebuttal case, which is

23   very unusual, also, in trials before you.  And we won't really

24   know for sure what's required in rebuttal until we see what

25   the defendant tries to do either through the midst of our case

1    or in his own.  And there's all sorts of things that are so

2    irrelevant, in our view, to the government's case that it

3    wouldn't make any sense to try to cut off all of those avenues

4    along the way in the government's case in chief.  It just

5    wouldn't be presenting evidence to the jury that makes any

6    sense.  So that's sort of the context within which we filed

7    this motion.

8           THE COURT:  Well, it's interesting because -- in

9    your reply brief you make that argument, and you make it in

10    your opening brief, too.  But one of the things that you said

11    in your reply brief basically was -- I'll paraphrase if I

12    can't find it.  It's basically that you've laid out the

13    evidence, and his arguments don't fit with what the proof is.

14    I mean, that's basically your argument.  But, one, I don't

15    think you know what his defense is; and, two, it's not

16    necessarily true that the way you view the evidence is fact.

17           MR. RACICOT:  (Nodded head affirmatively.)

18           THE COURT:  I mean, I'm not saying that you're

19    manipulating things, but it's possible that there could be an

20    explanation.

21           For instance, on the tax fraud, just as an example,

22    he says he was doing the bidding of Mr. Goguen and all of it's

23    out in the open, and then there's the tax fraud.  Well,

24    Mr. Goguen gave him the money.  Was he paying him?  Did he

25    file a 1099 for $2.3 million?  I mean, there are different

1    ways, I think, of viewing the evidence, which leads me to my

2    point, and that is I think frequently it is very difficult for

3    me to contextualize a motion *in limine* without knowing what

4    the proof is.

5            MR. RACICOT:  I think without question, Judge.  And

6    that's why, when I've responded to them over the years, I

7    generally ask the Court, ask you to deny it as unripe and wait

8    and see how things unfold at trial.  And I think ultimately

9    that's probably what you should do here.  I mean, we do think

10   there's categories that you will ultimately conclude do not

11   need to be admitted.  But more than anything else, we wanted

12   to put the ideas on your radar.  For instance --

13           THE COURT:  Well, I do think -- there's one aspect

14   that I'm having a little trouble wrapping my head around, and

15   that is I can understand communicating about various liaisons

16   the two of them may have had.  I'm not sure photographs about

17   what they were talking about has any relevance at all.

18           So, I mean, I think that's probably the strongest

19   one for -- but what's -- your argument is that has nothing to

20   do with the case and you don't need it, even if you get

21   whatever the text is into evidence.

22           MR. RACICOT:  Correct.  And, and it would be offered

23   just to make the victim look bad.  That's the only reason to

24   put it in; that, "If we can make the victim look bad enough,

25   then that will overwhelm whatever other evidence we have of

1    Mr. Marshall's guilt.  And it has nothing to do with whether

2    or not the victim is credible.  We just want to make him look

3    bad."

4                THE COURT:  So how did this case start?  Did

5    Mr. Goguen make a complaint to the FBI?

6                MR. RACICOT:  Yes.

7                THE COURT:  Is that what happened in that last case

8    involving Mr. Goguen, that he complained to the FBI?

9                MR. RACICOT:  Yes.

10               THE COURT:  And the state cases involving

11   allegations that the law enforcement in Kalispell or Whitefish

12   was investigating, those were the result of complaints by

13   Mr. Goguen?

14               MR. RACICOT:  I don't -- so I think Mr. Goguen

15   took -- I don't know if he went directly to the federal

16   authorities or if he started with state or local law

17   enforcement as it relates to this case.

18               THE COURT:  Um-hmm.

19               MR. RACICOT:  The cases at the state level are

20   primarily complaints by others about Mr. Goguen.  He is the

21   subject of those complaints.

22               THE COURT:  So the fact that he's complaining to the

23   FBI, is that relevant, how this thing starts?  I mean, I don't

24   know.  There's other people involved in this, and --

25               MR. RACICOT:  Yeah, so --

1          THE COURT:  -- I mean, I just have to say Mr. Goguen

2     apparently is very -- he must be very intelligent given the

3     fact of his wealth.  I mean, you can't get to where he is in

4     the absence of some sort of intelligence.  And when I read

5     your brief about what he was believing?  I mean, I've got to

6     say, my goodness, how could you, how could you believe that?

7     But that's just me.  That's gonna be for the jury.  But I

8     don't know.  It just seems kind of strange.  The whole story

9     seems strange to me.

10         MR. RACICOT:  (Nodded head affirmatively.)

11         THE COURT:  And, I mean, I have so many questions

12    that we're looking into, but -- and this has nothing to do

13    with your motion *in limine*, but is it a reality that private

14    companies can do off-the-books renditions or missions on

15    behalf of the CIA?  Is that going on all the time?

16         MR. RACICOT:  From everything that we've been told,

17    it never happens, and it never has, and it didn't here.

18    That's, that's from everything that I've been told from the

19    people who should know.  Now that's still somewhat of the

20    other issues that's hanging out there, is what is going to be

21    presented to the Court by way of the CIPA litigation, the

22    Classified Information Procedures Act litigation, and I think

23    that Mr. Bechtold anticipates making a filing under Section 5.

24    I have no idea what's going to be contained in that filing.

25    And pursuant to the order you entered, we'll get an

1    opportunity -- the people with knowledge will get an

2    opportunity to vet whatever is presented there.

3          But, so, we only sort of know one side of the story

4    right now, which is the side we've tried to run to ground, and

5    that's that Mr. Marshall had no affiliation with that agency,

6    never did any work for that agency, never was a contractor for

7    that agency, and that those sorts of renditions and missions

8    do not happen and did not happen here.

9          So "no" is the short answer.  As far as we know,

10   that doesn't happen.  Never does where they, where they

11   recruit private individuals, private companies, private money

12   in order to makes things happen that you would assume the

13   government is doing on its own.

14          THE COURT:  What's the security company that

15   Mr. Goguen started that's apparently located up there?

16   It's -- it starts with an A.

17          MR. RACICOT:  Yeah.  It's call Amyntor Group.

18          THE COURT:  Um-hmm.

19          MR. RACICOT:  And that was the company that he

20   formed with Mr. Marshall, and Mr. Marshall was the CEO of that

21   company.  It was dissolved in around September of 2018 so it's

22   not a going concern anymore, but that's the company that

23   Mr. Marshall ran that Mr. Goguen essentially was the

24   primary -- I mean, the sole funder for, for at least most of

25   its existence.

9

1          THE COURT:  But most of the payments that are at

2    issue were made before October 13th of two thousand- -- or

3    19th of 2013, which is the day that security company was

4    established.  Right?

5          MR. RACICOT:  Right.  So once Amyntor -- so when

6    Mr. Marshall first got together with Mr. Goguen

7    professionally, he went on the payroll of the company called

8    Two Bear Security, which is a different company that

9    Mr. Goguen has, and he got W2 wages from Two Bear Security

10   until Amyntor was fully formed.

11         When Amyntor was fully formed, Mr. Marshall and the

12   other Amyntor employees that were hired over time all got W2

13   wages from Amyntor Group.  And that was all from funding that

14   was put into Amyntor Group by Mr. Goguen to the tune of, I

15   want to say, somewhere around $11 million over the course of

16   the years.  And that, that company was going to attempt to

17   become something along the lines of what Blackwater had been:

18   provide training, provide security, provide security forces in

19   the Middle East, you know, guard details for people and things

20   like that.  It never really took off, so eventually it was

21   dissolved.

22         During the midst of their professional relationship,

23   what we've alleged in our case is entirely separate from

24   Mr. Marshall's work for both Two Bear Security and Amyntor

25   Group, and it relates only to him going to Mr. Goguen and

1   asking for funding on those five specific occasions for these

2   purported missions.

3            THE COURT:  Did you get Mr. Marshall's phone from

4   state law enforcement?

5            MR. RACICOT:  Mr. Bechtold did pursuant to a Rule 17

6   subpoena.

7            THE COURT:  Well, how did the, how did the agents --

8   how did the sheriff's office, or whoever, have that phone in

9   the first instance?

10           MR. RACICOT:  Mr. Marshall took it in to them when

11  he wanted to report an alleged murder-for-hire scheme that

12  Mr. Goguen had put him up to.

13           THE COURT:  Okay.  And so apparently there's some

14  kind of dispute about the messages and whether or not they

15  were doctored on Mr. Marshall's phone?

16           MR. RACICOT:  Yeah, and I don't think -- and that's

17  why we -- I added something in the reply brief about that.  I

18  don't think that's as extensive as -- I didn't want to

19  overrepresent what we think the disputes are as it relates to

20  the authenticity of messages.  We've compared a huge volume of

21  messages obtained from Mr. Marshall's phone that he provided

22  to the Whitefish Police Department to the messages that we

23  obtained directly from the victim, and they are almost, in

24  every instance, they're almost a perfect overlay.  There's

25  only a few discrete instances where we think Mr. Marshall was

1    fudging the documents, and it was to enable him to try to keep

2    the house that he was living in in Whitefish during the midst

3    of the Amyntor dissolution.

4            So when he came up to Montana, it wasn't very clear

5    initially exactly what the new company was going to be.  It

6    became Amyntor Group, but initially they even referred to it

7    in some initial communications as Newco, just N-e-w-c-o, "this

8    new company that we're going to form together."  And so he got

9    put on Two Bear Security's payroll, and Mr. Goguen bought a

10   residence for Mr. Marshall to live in, and he lived in it up

11   until the time that Amyntor was dissolved.  But Mr. Goguen

12   owned the house, and there's a lot of communications between

13   both Mr. Marshall and Mr. Goguen where it's very clear that

14   Mr. Goguen is the owner of the home but Mr. Marshall can live

15   there for essentially as long as he's working up there for

16   Mr. Goguen.

17           So when Amyntor gets dissolved, Mr. Marshall, I

18   assume, sees the writing on the wall that he's gonna be asked

19   to vacate the residence and actually communicates that to

20   Mr. Goguen and basically says, "You can do what you want with

21   the house, but I would hope you would give me a little bit of

22   notice because I'm there with my family and my daughter is in

23   school," and that sort of thing.

24           But separate and apart from that, in a state court

25   filing related to the dissolution, he files a purported email

1    from Mr. Goguen to Mr. Marshall representing that he,

2    Mr. Marshall, is actually the owner of that home.  And he's

3    clearly not.  And he's acknowledged as much.  But for whatever

4    reason, he doctors up an email and submits that as an

5    attachment to a court filing in the dissolution proceedings

6    for Amyntor.

7         So that's one of those instances where there's a

8    forgery.  And there's a couple of others, but they aren't as

9    replete as the defendant's response would make the Court

10   think.

11        THE COURT:  So you mentioned an issue that concerns

12   me, maybe not my law clerks, but it concerns me, and that's

13   the foundation for the phone stuff.  And has Mr. Goguen's

14   phone been examined by a forensic digital examiner?

15        MR. RACICOT:  No, the phone has not.  So his email

16   accounts have been, including the email account from which he

17   sent the email about the house to Mr. Marshall that was later

18   changed and submitted in state court, and that's one of the

19   experts that we noticed up.  That's the individual from LMG

20   Security here in Missoula.  He forensically examined

21   Mr. Goguen's email accounts, both of them.  He has two Gmail

22   accounts, and he examined both of them.

23        And he's basically prepared to testify, "I didn't

24   see anything suspicious about any of the emails that I looked

25   at on Mr. Goguen's accounts.  I didn't see any signs of

1    manipulation specifically as it relates to this email about

2    the house, and I can't really tell anything about

3    Mr. Marshall's version of it because it's just a PDF document,

4    so I don't know -- I don't have any metadata.  I don't have

5    any background supporting information for Mr. Marshall's

6    version of it.  I can just tell you they're different.  It

7    would be easy to manipulate the one that ends up a PDF, and I

8    don't see any irregularities as to Mr. Goguen's."

9            But his phone has not been examined, but that's,

10   again, where almost all of these text messages between them

11   are entirely consistent between the two phones.

12           THE COURT:  So tell me:  What's the foundation for

13   getting that into evidence?  Does Mr. Goguen or Mr. Marshall

14   get on the stand and say, "That's not my -- I didn't write

15   that," or, "Yes, I wrote that," or how -- what's the

16   foundation of evidence that you extract?  And if there's a

17   dispute about the accuracy of either message of either one of

18   them, what's the foundation?

19           MR. RACICOT:  I think you're right.  The foundation

20   is a witness saying, "This is what I say that it is.  This is

21   a text message that I sent" or "a text message that I

22   received."  And if, and if there doesn't appear to be a

23   genuine dispute, then I think that lays the foundation, and

24   everything else goes to the sufficiency, goes to the weight

25   that the jury wants to give it.

14

1            THE COURT:  So why -- I took a quick look at the
2    Crime Victims' Rights Act.  Why is Mr. Goguen called John Doe,
3    and why is he not named if, in fact, he's a victim?  And, I
4    mean, there isn't anything I can see in the Crime Victims'
5    Rights Act that -- he's not a minor.  He's -- I mean, all of
6    the things that are set forth there, he doesn't qualify for
7    any of them.  I mean, just that he doesn't want to be
8    embarrassed?

9            MR. RACICOT:  Actually I don't think he cares,
10   Judge.  Our office policy is not to identify victims by name
11   in filings with the court, and that's regardless of the nature
12   of the case or the age of the victim.  It's just -- that's
13   just how we identify the victims, and that's evolved over
14   time.  When I started, we would use initials.  We'd use the
15   victim's initials, and then eventually it morphed into
16   basically an office policy that says don't -- we just want to
17   use John and Jane Does for victims and not identify them by
18   name.

19           THE COURT:  Yeah.  My question is:  Is there some
20   legal reason why his name is not in -- I mean, Mr. Bechtold
21   refers to him specifically by name in briefs that are filed.

22           MR. RACICOT:  Right.  I don't know, I don't know if
23   we think it ties back to the Crime Victims' Rights Act -- I
24   haven't looked at it recently so I don't know -- or if it's
25   just department guidance or our own office's policy as we

1    interpret that act.  I don't know how formal or informal it is

2    other than it's our office's formal policy.

3          THE COURT:  Well, anything else that you want to

4    argue about those motions?  I've read all of the briefs and

5    the motions.

6          MR. RACICOT:  No.  I knew that you would.  And I

7    guess nothing really, Judge.  I mean, there was just the

8    specific points we made about the rules.  I don't know, in

9    some instances, the vehicle by which Mr. Marshall thinks he's

10   gonna get into everything that we think he might want to get

11   into.

12         And, you're right, we don't know exactly what his

13   defense is, and we don't know exactly what he wants to get

14   into.  And I want to be clear:  We don't -- I don't have any

15   issue, we don't have any issue with an aggressive and, as I

16   put in the brief, searing cross-examination of the victim.

17   There's no issue there.

18         The issue that we have is there is so much swirling

19   around this case that just simply isn't true, and it's easily

20   proved to be false.  But if every one of those roads is

21   ventured down, we could be coming back and asking you for some

22   significant additional amount of time to put on a significant

23   number of additional witnesses and exhibits, all to try to

24   sort of put toothpaste back in the tube on issues that have no

25   bearing to his defense.

1          So just to go back a minute to the tax issue, I
2    think there's no question that questions to the victim and
3    information from the victim about how, if at all, he treated
4    these monetary donations, offerings, contributions to
5    Mr. Marshall from a tax perspective?  Totally relevant.  I
6    think the answer is gonna be, "I didn't deal with them at all.
7    It's essentially discretionary income, and I used it to give
8    to Mr. Marshall to go on these missions."  But those questions
9    are, I think, totally in line.
10         But every other aspect involving this guy's taxes
11   when there's multiple entities and trusts -- he's had
12   different companies over different periods of time -- you
13   could get to a situation where we're spending days on this
14   guy's taxes that have no bearing on Mr. Marshall's defense, no
15   matter what his defense is.  But specific, targeted questions
16   about "What did you do with these wires from a tax
17   perspective?" I think are totally legitimate.
18         And we have no issue with anything being asked of
19   the victim that has some basis in fact, but we just know
20   there's a bunch of things that don't, and we just kind of
21   wanted to put that on your radar so that when we start going
22   down some of these rabbit holes, if we end up going down them,
23   you know what our perspective is on it, you know where we're
24   coming from if we come back at the end of the defense case and
25   say we've got a little bit more of a rebuttal case than we

1    normally do.  I mean, I don't recall doing rebuttal in almost

2    any of my trials with you, and maybe it's one witness,

3    re-calling the agent or something.  This would be more

4    extensive, at least that would be our request if we're trying

5    to correct, frankly, correct the record, which is also our

6    obligation as we go along.

7              THE COURT:  Well, in the abstract, if there's

8    $2.5 million or $2.3, whatever the number is, and that is

9    given to Mr. Marshall by Mr. Goguen, but Mr. Marshall expends

10   the money however either he's directed or whatever, is he

11   responsible for all of that money on taxes or just the amount

12   that went to his personal benefit?

13             MR. RACICOT:  So the revenue agent will do a better

14   job of explaining this than I can, but essentially you're

15   responsible for all of it.  Now let's say in a hypothetical

16   world you went on these missions.  Then you would have costs

17   associated with that, so you would be in a position to say, "I

18   spent this much on travel, and I spent this much on equipment,

19   and I spent this much paying the guys that went along with

20   me."  So you might have a lot of offsets that would take the

21   ultimate tax obligation down significantly, maybe all the way

22   down to zero.

23             But as it starts out, it's basically like any money

24   for any of the rest of us.  Income is income.  If you find $10

25   on the street, in theory that is income, and this is income to

1    you, and then there's just a question of whether you would

2    have any deductions or offsets.  But the way that he spent it,

3    there would not be any.

4             THE COURT:  But if, on the other hand, he is a

5    conduit for Mr. Goguen to get money or whatever to liaisons

6    from the past, is that taxable to him?

7             MR. RACICOT:  So I don't --

8             THE COURT:  He's, he's the courier.  He's kind of

9    like a lawyer in New York and somebody else.

10            I mean, is that money taxable to him just because --

11   I don't know if that's what a jury would find, but apparently

12   that's part of the argument, is, you know, "I wasn't going on

13   missions.  I never said I was going on missions.  I was

14   following directions from Mr. Goguen to take care of" --

15   whatever.

16            MR. RACICOT:  Right.  So my guess is that's no.  My

17   guess is if you give me $10 to give to Mr. Bechtold, "Give

18   this $10 to Tim Bechtold," then I just take it and give it to

19   him and I'm simply a conduit, my guess is that is not income.

20   I feel like I should commit to that but I don't know with

21   enough certainty.  But I don't think so.

22            THE COURT:  Well, who decides that?

23            MR. RACICOT:  Well, even what he's represented in

24   his defense brief is that a lot of it was essentially a

25   management fee.  "I was managing all of Mr. Goguen's

1  headaches.  I was putting out all of his fires.  I was

2  managing property up there, and then I was managing other

3  issues on the side, and this money was given to me both to

4  pass on to other people on occasions but also essentially to

5  serve as the manager of all of his various issues up in the

6  Flathead Valley."  That would clearly be income.  Now, again,

7  there might be some offsets to it, but that's just like paying

8  a property manager.  I mean, that's income to you, and then

9  there might again be some deductions or offsets, but that,

10  that would definitely be income.

11          Now if he changes that story at some point and says,

12  "No, all of it was strictly from Goguen to me to somebody

13  else," or some other group of others, then I guess we'll have

14  that argument, but that's not, that's not been indicated even

15  in the response brief to this point.

16          THE COURT:  All right.  Anything else, Mr. Racicot?

17          MR. RACICOT:  I don't think so, Your Honor.  Thank

18  you.

19          THE COURT:  All right.

20          Mr. Bechtold.  You can take that mask off while

21  you're arguing.

22          But let's start with what I think is probably the

23  easiest issue that Mr. Racicot raises:  The pictures of

24  various individuals in various states of dress or undress,

25  what relevance has that got to anything?

1          MR. BECHTOLD:  Your Honor, the whole purpose of

2    putting in many of the text exchanges between the two is not

3    to make Mr. Goguen look bad but it's to establish the

4    relationship that Mr. Goguen had with Mr. Marshall.  We, I

5    don't think, have any, any objection to blacking out many of

6    the pictures that are in their text exchange.

7          THE COURT:  Okay.  So technically tell me what,

8    what, what is the evidence?  Is it a picture of a screen and

9    with text message and images?

10          MR. BECHTOLD:  Correct.  So what it is is so if, if

11    you download a text chain, and in this case these text chains

12    have been downloaded into PDF documents, where, if you have

13    seen text exchanges, you know one side is in one color and it

14    says their text, and the other side is a different color and

15    it says the response, and then occasionally there's a

16    photograph interjected and so you can tell who the photograph

17    was put on by.  And so it's just, you know, hundreds of pages

18    of text exchanges, some of which include photographs.

19          THE COURT:  So what's the relevance of the

20    photographs?  Is that part of an argument that that was an

21    individual that money went to, or is it just that was somebody

22    or some person that was the topic of conversation between the

23    two of them?

24          MR. BECHTOLD:  In many cases it's persons that

25    Marshall delivered money to eventually.  But we're not really

1    concerned about having the -- I mean, the photos can be

2    blocked out, or the lascivious, lascivious parts can be

3    blocked out.  That's, that's fine.  It is certainly true that

4    many of the photographs are of women in provocative poses

5    without clothes on.

6           THE COURT:  Um-hmm.

7           MR. BECHTOLD:  That's certainly true.  But many are

8    not.  But I don't think -- Your Honor, when we have the

9    exhibits prepared for the Court for trial, you can certainly

10   look at them and decide at that point what should be, what

11   should be omitted and what should be included.  I think it

12   will be a very straightforward exercise.

13          THE COURT:  Okay.

14          MR. BECHTOLD:  Your Honor, as the Court may be

15   aware, we have asked Mr. Goguen to produce his phone for a

16   forensic evaluation, and he has refused.  In his response to a

17   subpoena *duces tecum*, he has refused to produce his phone or

18   his computer for a forensic evaluation.  And so what we have

19   at this point is Mr. Marshall's record of the text exchange

20   and with Mr. Goguen's start in June of 2013.

21          However, many of the purported texts that Mr. Goguen

22   has produced in his curated document that he provided to the

23   government includes things prior to June of 2013.  And what we

24   simply want is an opportunity to have a forensic expert take a

25   look at those texts and determine whether or not they're

1    valid.

2           It is certainly true that there are some -- there

3    are differences in the, in the text record for those where

4    there was a forensic evaluation of Mr. Marshall's phone with

5    what Mr. Goguen provided to the government for the dates after

6    June of 2013, which is why we think that there, there is a

7    reason that we should have an opportunity to examine

8    Mr. Goguen's.

9           THE COURT:  Okay.  So was Mr. Goguen served with a

10   subpoena *duces tecum*?

11          MR. BECHTOLD:  He was.

12          THE COURT:  How long ago?

13          MR. BECHTOLD:  It was in December.  And he was

14   provided, in conversations with his counsel, he was provided

15   until February 1, that is on Monday, to respond.

16          THE COURT:  And respond to who?  You?

17          MR. BECHTOLD:  Correct.

18          THE COURT:  I thought that under the rules of

19   criminal procedure, if there's a subpoena *duces tecum*, there

20   is a procedure to quash.  Maybe it's because of COVID-19, but

21   I haven't seen anything that would be something -- a motion to

22   quash the subpoena *duces tecum*.

23          MR. BECHTOLD:  No, there is not, Your Honor.  And

24   just because I received the response to the subpoena on Monday

25   evening and yesterday I was preparing for this hearing and

1  doing other matters associated with this case, I haven't had

2  an opportunity to confer with Mr. Goguen's counsel about that.

3  However, that is -- you're absolutely correct that is the

4  method to deal with the subpoena *duces tecum*, and I will

5  confer with his counsel and bring that to his attention.

6           THE COURT:  Okay.

7           MR. BECHTOLD:  Regardless, I think that as

8  Mr. Racicot sort of pointed out, I think the proper procedure

9  here is, you know, we prepare our final pretrial order, we

10  prepare our exhibits, and at that point -- and we prepare our

11  testimony or our list of witnesses, and as the Court is aware

12  of what the proof is for each of these various items, at that

13  point is the appropriate time to determine whether it's

14  appropriate under Rule 402, 403, or 404.

15           So I think that it is somewhat premature for the

16  Court to rule on anything that the government has brought to

17  the Court's attention.  However, as Mr. Racicot has pointed

18  out, this is an opportunity for both parties to inform the

19  Court about what things that we think should be on your radar.

20           And in terms of the four specific areas that

21  Mr. Racicot has pointed out, the previous legal proceedings,

22  one dealing with Bryan Nash, and I presume he's talking about

23  another one dealing with a woman named Amber Baptiste, those

24  are both relevant in this case because Mr. Nash's spouse is

25  one of the women to whom Mr. Goguen gave a significant amount

1    of cash because of a sexual liaison he had with her, which I

2    presume is what triggered Mr. Nash's actions that eventually

3    led to his five years of probation.

4            So the -- and the information about his previous

5    romantic relationships, I think, is important.  Just case in

6    point, last week in supplemental discovery we were provided

7    with some amended tax returns that Mr. Goguen has recently

8    filed for these, for the years in question, 2012, '13, '14 --

9    2011, '12, '13, and '14, where he had not previously disclosed

10   to the government a series of cash payments to numerous women.

11           In those cash payments, totaling many millions of

12   dollars, you know, he then, you know, told the government,

13   "Look, I made a mistake.  I didn't disclose that I, that I

14   gave all this money to all these women.  I am now gonna pay

15   the taxes on it."  And, and in one case in 2013, he, he had an

16   additional $2.3 million in taxes to pay and another $1.2 in

17   fines and late fees.

18           So I think it's relevant to show the amount of money

19   that Mr. Goguen was passing to these various women -- in some

20   cases, 30 or 40 women every year -- mounting in the millions

21   of dollars, and Mr. Marshall was involved in passing that

22   money along.

23           So I think it's, for nothing else, it's important to

24   show that, the level of money that Mr. Goguen was just passing

25   around, and it's to show that giving, you know, $400,000 to

1    Mr. Marshall is sort of -- it's, as our forensic accountant

2    says, it's the rule of zeros.  At some point, an individual

3    with the wealth that Mr. Goguen has, for a normal juror to

4    understand it, knock off four zeros from the end and that sort

5    of shows how much money they're dealing with.

6            So I think that -- and then regarding the taxes,

7    again, I think, for example -- and I brought along an exemplar

8    of these amended returns to show that -- for those taxes to

9    show that the money that Mr. Goguen was giving away to the

10   women, I think that those, those taxes are certainly relevant.

11           In terms of, you know, Mr. Goguen's taxes dealing

12   with his various companies -- and, you know, he owns, you

13   know, over two dozen companies.  I don't think those taxes are

14   necessarily relevant to the case.

15           What I do think is relevant to the case is how he

16   accounted for the money that he gave Mr. Marshall.  It's

17   certainly true he did not give Mr. Marshall a 1099 or a W2 for

18   that money, so it would be interesting to know how he

19   accounted for it.  So I think in that regard the tax forms are

20   relevant to Mr. Marshall's defense.

21           And then lastly, talking about Mr. Goguen's

22   relationship with Shane Erickson, Mr. Erickson was a detective

23   with the Whitefish Police Department, and Mr. Racicot has

24   represented that Mr. Marshall was making a complaint about

25   Mr. Goguen's murder for hire.  It actually was the Whitefish

1    Police Department that contacted -- because of information

2    that Mr. Nash had provided to the Whitefish Police Department,

3    the Whitefish Police Department contacted Mr. Marshall.

4           So unlike the situation with Mr. Goguen where, you

5    know, on at least four separate occasions that I'm aware of

6    where he initiated complaints with the FBI to try to get the

7    FBI to do criminal investigations of individuals, not just

8    Nash but also Woods and Baptiste and Mr. Marshall -- and even

9    over a property dispute in Whitefish.  You know, Mr. Goguen

10   owns, you know, 14 different properties in Whitefish where he

11   would put people who worked for him or put women that he was

12   supporting into.  And occasionally -- he, in one case, was

13   involved in a property dispute about what he had actually

14   purchased and what was about it, and he tried to get the FBI

15   to investigate that.

16          So I think that when we're talking about where

17   404(a)(2) applies, I think that there's a, there's a lot of

18   instances here where Mr. Goguen's pattern of behavior is

19   certainly fodder for the jury to consider.

20          THE COURT:  So this CIA off-the-books stuff, I mean,

21   it sounds weird to me but maybe it's true.  I don't know.

22   That's something that maybe a jury is gonna have to decide.

23          But don't you think you've got to have something

24   that would say at least there is a level of reliability on

25   what he's claiming?  That he just can't come in here and say,

1    "You know, here's what happened.  I'm not an agent."  I don't

2    know what the terminology is, but, "I worked for the CIA in

3    off-the-books renderings and planning the invasion in Iraq.

4    My colleagues did.  But I can't, I can't, I can't give you the

5    documentation about that because that's a violation of the

6    national security laws," and all that sort of stuff, "and

7    you're just gonna have to take my word for it."  Is that where

8    we are with those kinds of claims?

9              MR. BECHTOLD:  No, Your Honor, and the defense's

10   intention is to file the CIPA Section 5 notice today, so I

11   think the Court will be much better informed about those

12   issues.  I think that -- and the Court can make those calls

13   once it's aware of the information we provide in that

14   Section 5 notice.

15             I think, Your Honor, Mr. Goguen's claims to the

16   government are based upon his interpretations of perhaps some

17   stories that he may have heard Mr. Marshall and others talk

18   about.  But I think that there is no question that

19   Mr. Marshall never carried off off-the-books rendition

20   activities on behalf of Mr. Goguen, paid for by Mr. Goguen.

21   They never happened.  And though Mr. Goguen may claim so now,

22   it certainly is fantastical.

23             THE COURT:  So does he have a DD 214?

24             MR. BECHTOLD:  He does, Your Honor.

25             THE COURT:  And is Mr. Racicot's representations

1   about his service accurate?

2          MR. BECHTOLD:  The representations about -- I think

3   there is no dispute about Mr. Marshall's Marine service.

4   However, before I speak further on that, I would ask the Court

5   to wait until it has an opportunity to review our CIPA

6   Section 5 notice.

7          THE COURT:  Well, tell me what -- so there's

8   representations that part of the issues were, if I can

9   remember the language, some 90-some instances where -- that he

10  wasn't present for inactive duty?  I don't get it.  If you're

11  on active duty, I get that.  If you're in the reserves, I get

12  that.  I don't get how you can be disciplined for inactive --

13  failure to be someplace when you're inactive.

14         MR. BECHTOLD:  Okay.  Your Honor, he was in the

15  reserves, and what he, what he did not attend were the weekend

16  training sessions for the reserves.  So there was a total of,

17  I think, 84 weekend training sessions that Mr. Marshall did

18  not attend while he was in the Marine Corps Reserves.  And for

19  that reason he was less than honorably discharged from the

20  reserves at that time.  And there's -- that is the record of

21  the -- as established in his DD 214 that the government is

22  aware of.

23         THE COURT:  Okay.

24         MR. BECHTOLD:  And, again, I would, I would just ask

25  the Court to hold that thought until it has an opportunity to

1    review our notice.

2              THE COURT:  Yeah.  And then there's something else.

3    Apparently you weren't aware of the request for the transcript

4    in front of Judge DeSoto.

5              MR. BECHTOLD:  No, I was not.  And after the Court

6    issued its order, I asked Mr. Marshall what the deal was, and

7    he told me that he was not aware that -- he just went to the

8    public's website and put in the order.  He wasn't aware that

9    it was something that he would necessarily contact counsel

10   for.

11             THE COURT:  I think you should have a heart-to-heart

12   with him about how that all came about, because the

13   information I have would be markedly different than what you

14   were able to represent after talking to him.  So I think it

15   would behoove you and Mr. Marshall to get on the same page on

16   that one, not that it has anything to do with this other than

17   putting you in a compromised position about representations

18   made to the Court.

19             MR. BECHTOLD:  I agree, Your Honor.

20             THE COURT:  Anything else you want to argue?

21             MR. BECHTOLD:  No, Your Honor.  Just, in summary, I

22   think that Mr. Racicot is correct that these are issues that I

23   think are best ruled upon at the time of trial.

24             THE COURT:  All right.  So Mr. Racicot mentioned

25   something about -- I think it was the other case involving

1    Mr. Goguen and the volume of exhibits and that sort of thing.

2    And the way we addressed that was to put a time frame for

3    Mr. Racicot to advise the witness -- who he was gonna call as

4    witnesses and what exhibits he was gonna use.

5              Now given everything that's happened so far, and

6    without taking into account the Section 5 issue, are the

7    parties in a position to, one, agree on whether or not any

8    marked exhibit or proposed exhibit is admissible?

9              And I know you're not obligated to lay out what your

10   case is and perhaps I should be asking Mr. Racicot, but my

11   inclination is, after looking at the issues you intend to file

12   under Section 5, is that it would be helpful for everybody,

13   including the Court, in terms of planning to know how many

14   witnesses we are going to have, and that would be helpful to

15   get that information from you, also.  I realize you have no

16   obligation to reveal anything until your case, but perhaps you

17   and Mr. Racicot can work that out.

18             And then do you think it's feasible, from the

19   defense standpoint, to get an order like that, and would it be

20   helpful in preparing for the trial?

21             MR. BECHTOLD:  Your Honor, as you're aware, the

22   defense has essentially put a list of proposed witnesses

23   before the Court in other filings, but I think that certainly

24   from -- the defense is certainly willing to cooperate with

25   Mr. Racicot on determining his witnesses and his exhibits, and

1    I think that to a large degree we can certainly tell

2    Mr. Racicot what we intend to put on.

3            THE COURT:  All right.  Well, let me hear what

4    Mr. Racicot has to say.

5            Are we in a position to -- and I realize what you've

6    argued about rebuttal and that sort of stuff.  In terms of

7    trying to plan for how much time and how long we're going to

8    need jurors, is it feasible to get a list of people you intend

9    to call or are likely to call and identify exhibits so we can

10    determine whether or not there are objections to them?

11            MR. RACICOT:  Yes.  We anticipate calling

12    32 witnesses.  We'll probably cut a few, but as of today we've

13    got 32 witnesses on our list.

14            I have sort of anticipated that we'd probably -- I

15    think it's possible to do the case in five trial days.  I sort

16    of feel like it would roll over into the next week to maybe,

17    you know, Tuesday or Wednesday of the next week, but, again,

18    we might be able to trim it a little bit.

19            And, yes, I'd ask for maybe another week or so, but

20    we've got most of our exhibits ready.  I need a little more --

21    I'm still working on the agent's exhibits, some of the

22    financial things, but I think we'd probably end up agreeing on

23    a great many of the financial documents that are coming in.

24    There's really no dispute.  Those records say what they say.

25    And if Mr. Marshall's theory is as it's been explained to the

1    Court, he's not shying away from where the money went.

2           So my guess is we could probably agree before trial

3    that a lot of exhibits would be admissible, at least a lot of

4    the government exhibits.  There might be disputes about some

5    of the victim communications, but --

6           THE COURT:  Yeah.  I think what is likely to be

7    helpful, if you get all that together, that maybe a week

8    before the trial date we have an on-the-record conference to

9    see if any exhibits can be admitted so that we don't have, you

10   know, four days of laying foundation for something that's

11   really not in dispute and we just get to the merits of it.

12          MR. RACICOT:  That would be great.  And we can get

13   them -- we could then give them to both the Court and

14   Mr. Bechtold probably at least a week in advance of that in

15   order to give both Your Honor and Mr. Bechtold time to look at

16   them before we came in for that final pretrial to make those

17   decisions.

18          THE COURT:  Okay.  Well, we'll set that.  I'll set

19   some dates, and then we'll get that laid out.

20          MR. RACICOT:  Okay.

21          THE COURT:  That would be helpful.

22          And then I do believe -- we're doing it on the

23   record unless he waives being present.  Mr. Marshall would

24   have the right to be at that conference where evidence is

25   being discussed.  So I assume you don't have any objection to

1    that.

2              MR. RACICOT:  No, absolutely not.  In fact, we have

3    them all loaded up into Trial Director, and we could pull

4    stuff up on the screens as needed, you know, so that everybody

5    is looking at the same thing and working on the same sheet of

6    music.

7              THE COURT:  Okay.  Very good.

8              Well, in all likelihood, with the exception of the

9    photographs that were discussed in the briefing -- I'm likely

10   to grant that motion *in limine*, but the rest of them, after

11   reading the briefs, and I'll visit with my law clerks about

12   it, but my inclination is, as usual, it's hard to

13   contextualize evidence in the abstract.

14             MR. RACICOT:  Sure.

15             THE COURT:  So if neither of you has anything

16   further, then we will be in recess.

17             Thank you for the briefing and for the argument.

18             MR. RACICOT:  Thank you, Your Honor.

19        (Proceedings were concluded at 09:52:00.)

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2           I, JoAnn Jett Corson, a Registered Diplomate

3    Reporter and Certified Realtime Reporter, certify that the

4    foregoing transcript is a true and correct record of the

5    proceedings given at the time and place hereinbefore

6    mentioned; that the proceedings were reported by me in machine

7    shorthand and thereafter reduced to typewriting using

8    computer-assisted transcription; that after being reduced to

9    typewriting, a certified copy of this transcript will be filed

10   electronically with the Court.

11          I further certify that I am not attorney for, nor

12   employed by, nor related to any of the parties or attorneys to

13   this action, nor financially interested in this action.

14          IN WITNESS WHEREOF, I have set my hand at Missoula,

15   Montana this 31st day of March, 2021.

16

17                         /s/ JoAnn Jett Corson

18                         _____
                           JoAnn Jett Corson
19                         United States Court Reporter

20

21

22

23

24

25