**TIMOTHY J. RACICOT**
**RYAN G. WELDON**
**Assistant U.S. Attorneys**
**U.S. Attorney's Office**
**P.O. Box 8329**
**Missoula, MT 59807**
**105 E. Pine, 2nd Floor**
**Missoula, MT 59802**
**Phone:** (406) 542-8851
**FAX:** (406) 542-1476
**E-mail:** Tim.Racicot2@usdoj.gov
         Ryan.Weldon@usdoj.gov

**ATTORNEYS FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | CR 20-32-M-DWM |
| Plaintiff, | SENTENCING MEMORANDUM |
| vs. | |
| **MATTHEW ANTHONY MARSHALL,** | |
| Defendant. | |

### INTRODUCTION

Matthew Anthony Marshall pleaded guilty to one count of wire fraud in

violation of 18 U.S.C. § 1343, one count of money laundering in violation of 18

1

U.S.C. § 1957, and one count of tax evasion in violation of 26 U.S.C. § 7201. PSR ¶ 7. The presentence investigation report has calculated an advisory Guideline range of 57 to 71 months, based on a total offense level of 25 and a criminal history category of I. PSR ¶ 130. Both parties object to that range.

The United States believes the abuse of trust enhancement under USSG §3B1.3 should apply, which would increase the advisory Guideline range to 70 to 87 months. PSR Addendum at 1.

Marshall objects to abuse of trust. He also objects to the application of the specific offense characteristics under USSG §2B1.1(b)(9)(A) (misrepresentation that the defendant was acting on behalf of a government agency), and §2B1.1(b)(10) (sophisticated means). If his objections are sustained, the advisory range would be 41 to 51 months.[1]

The United States recommends a custodial sentence at the high end of the advisory guideline range, restitution in the amount of $3,254,327, three years of supervised release, and $300 in special assessments. The government also recommends Marshall be remanded at the conclusion of the sentencing hearing.

---

[1] Absent the application of §2B1.1(b)(9)(A) and (b)(10), Marshall's adjusted offense level for the wire fraud and money laundering would be 23 as opposed to the current level of 27 or the government's suggested level of 29. With a fraud offense level of 23 and a tax offense level of 22, two units would be assigned under §3D1.4, which would add two levels to the combined adjusted offense level (for a total of 25). After acceptance of responsibility, the total offense level would be 22, which results in an advisory range of 41-51 months.

# ARGUMENT

**1. Acting on Behalf of a Government Agency – USSG §2B1.1(b)(9)(A)**

Marshall objects to the two-level enhancement under §2B1.1(b)(9)(A), which applies "if the offense involved . . . a misrepresentation that the defendant was acting on behalf of a . . . government agency[.]" The pertinent application note reads as if it were written for this case:

> Subsection (b)(9)(A) applies in any case in which the defendant represented [he] was acting to obtain a benefit on behalf of . . . a government agency (regardless of whether the defendant actually was associated with the . . . government agency) when, in fact, the defendant intended to divert all or part of that benefit (e.g., for the defendant's personal gain).

USSG §2B1.1, n. 8(B). That is precisely this scenario. Marshall told the victim he needed money for missions organized by the CIA for the benefit of the United States and diverted the funds for his personal gain.

Marshall's first text to the victim about the fake missions claimed they were for the CIA: "Bare (sic) with this odd question, but it directly relates to the good guy stuff we have talked about. Are you interested in supporting a way off the books op for the Red Cross?" Exhibit 17 at 1; PSR ¶ 27.[2] After the fake mission, Marshall forwarded the victim a fake quote, allegedly from Cofer Black at the

---

[2] The exhibit numbers referenced in this memorandum were previously assigned in preparation for trial and the original trial numbers have been retained for the sake of consistency.

3

CIA, lauding his success: "Just wanted to pass on the text I just got, 'Anthony, as you can see from the recent news, your efforts and op execution paid off high order. Getting number 1 was a direct result of your commitment. Pass that on to our new friend as well. -CB'" Exhibit 22 at 2.[3]

The trend continued with the other missions. Before the second fake operation, Marshall, after falsely claiming Cofer Black had cancer, wrote that he "Inquired about another 'trip' to recover 2 personnel but I told him we probably wouldn't have that in the budget this year." Exhibit 25 at 2; PSR ¶¶ 33-34. The fourth fake mission involved Marshall working directly with government agencies – Delta Force and the CIA – and the money for the fifth "operation" was supposed to go directly to Navy SEALS for targeting operations in the Middle East. PSR ¶¶ 41, 46-47. Marshall touted every fictitious venture as being sponsored and authorized by the CIA, for the benefit of that and other agencies, which is exactly what the enhancement in §2B1.1(b)(9)(A) is designed to address.

Marshall cites *United States v. George*, 713 Fed. Appx. 704 (9th Cir. 2018) (unpublished), in support of his argument against the enhancement. PSR Addendum at 6. *George* involved vague references to government agencies, not

---

[3] This exhibit, and the others with the same format, are text messages from Marshall's phone, which he provided to the Whitefish Police Department in connection with an unrelated investigation. The messages are in reverse chronological order, with the oldest messages at the bottom of the last page of each exhibit. "Me" in all of these text exhibits is Marshall.

direct claims that money would be used to conduct government-sponsored missions for the benefit of government agencies and employees. *George* has no application here. Two other cases Marshall cites actually support the application to facts such as these. *United States v. White*, 850 F.3d 667, 675 (4th Cir. 2017) (applying the enhancement based on false tax documents and a voicemail message from an alleged tax collector); *United States v. Nieves*, 727 Fed. Appx. 721, 724 (2d Cir. 2018) (unpublished) (applying the enhancement when defendant misrepresented he was a federal immigration officer). The foundation of Marshall's scheme was to convince the victim to fund government-authorized missions to benefit government agencies. The two-level enhancement under §2B1.1(b)(9)(A) clearly applies.

   2. **Sophisticated Means – USSG §2B1.1(b)(10)(C)**

The sophisticated means enhancement applies if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means[.]" USSG §2B1.1(b)(10)(C). "Sophisticated means" is defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." §2B1.1, n. 9(B).

   The record in this case abounds with examples of Marshall's intricate conduct in the construction and concealment of his scheme to defraud. The

following are just some examples:

- Marshall sent the victim prayer beads he claimed he removed from the body of a dead terrorist to add color to his claimed CIA affiliation.  Exhibit 6.

- He showed the victim what he alleged was a legitimate, classified DD 214 that apparently referenced his extensive training and experience as a Force Recon Marine.  Exhibit 8a.  No such document exists in Marshall's military files.

- In addition to the fake text messages referenced above, in 2015, to perpetuate the myth he worked for the CIA under Cofer Black, Marshall obtained fake phone numbers using a phone application called Burner.  Exhibit 134.  He used two numbers with Virginia area codes, logged the numbers into his contacts as being affiliated with Black (so the messages would appear on his phone as having been sent from "Cofer"), and sent himself fake messages, purportedly from Black.  Exhibit 134i.  Cofer Black has never been associated with either Virginia number Marshall used via the Burner app and does not know Marshall at all.  Exhibit 338.

- Marshall used the same Burner app to send himself fake messages from alleged CIA colleagues that essentially claimed the CIA operative in the movie *Sicario 2* was based on him.  Exhibits 134, 134a, 134b.

- To fully embrace the Force Recon fallacy, Marshall got a Force Recon tattoo, which shows the lengths he was willing to go to misrepresent his military service and other aspects of his manufactured background.  PSR ¶ 111.

- When the pressure mounted concerning his credentials, he claimed he had a life-threatening medical condition, which is conspicuously absent from the information he provided to the Probation Office in preparation of the PSR.  PSR ¶¶ 111-113.  Marshall used the Burner app again to help substantiate that claim by subscribing to a Minnesota area code and sending himself fake text messages allegedly from neurologists at the Mayo Clinic.  Exhibits 134, 134c.

- After Marshall suspected he might be investigated and his scheme uncovered, he shifted from defense to offense in an effort to undermine the

victim's credibility. As part of that effort, Marshall created fake emails allegedly from the victim's accountant and provided them to the IRS in the hopes of making the victim the target of a criminal investigation. Exhibits 136b-136g.

The fake IRS emails require some explanation, which provides further evidence of the level of sophistication Marshall employed to execute the scheme to defraud. Exhibit 136b is an authentic email thread between Marshall and the victim's accountants, which Marshall used as a template for his fake messages. Exhibit 136c shows Marshall forwarding a partially-forged version of the authentic thread to one of his Protonmail accounts. Exhibit 136d contains copies of the fake emails that were found on a thumb drive in Marshall's home office during the execution of a search warrant in December 2018. Page 5 of that exhibit shows the metadata for those fake emails, reflecting creation dates of November 28, 2018. Exhibit 136e is a Google search Marshall performed one day later, November 29, 2018, inquiring "how to clean metadata from a forwarded email." Exhibit 136f is an email from Marshall's then-lawyer forwarding the fake emails to IRS Agent Brett Seamons. And Exhibit 136g, the same fake emails, were hard copies printed by Marshall and seized during the search of his residence from a manila folder labeled "Operation Lima." "Lima" was the victim's call sign during the time Marshall was in charge of his personal security.

*United States v. Horob*, 735 F.3d 866 (9th Cir. 2013), a case cited by Marshall in support of his objection, is instructive here. As the Ninth Circuit

noted, "Horob's scheme was complex. Horob did more than lie to obtain a loan. He manipulated several people to lie for him, used several different bank accounts (including accounts of other people) to move funds around, and fabricated numerous documents. Moreover, the complicated and fabricated paper trail made discovery of his fraud difficult." *Horob*, 735 F.3d at 872.

While Marshall is correct that the money trail in this case was not complex, nearly every other aspect of his fraud meets the definition of sophisticated means. The layers of lies he constructed surrounding his military and CIA experience made it almost impossible for the victim to question. His willingness to conjure fake emails and texts and forged DD 214s – among several other documents – and his ability to manipulate certain confederates to endorse his phony past, provided layers of insulation illustrative of a scheme that was "especially complex or especially intricate,' compared to the usual fraud offense." *Id.* (citing §2B1.1, n. 9(B)). The PSR properly included the two-level enhancement for sophisticated means.

### 3. Abuse of Trust – USSG §3B1.3

Marshall objects to the two-level abuse of trust enhancement under USSG §3B1.3. That guideline provides:

> If the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.

USSG §3B1.3. Discretion is particularly important when determining whether to apply the abuse of trust enhancement. "'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)." USSG §3B1.3, n. 1. To apply abuse of trust, "the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult)." *Id.*

Marshall correctly notes that abuse of trust cannot apply if the enhancement under §2B1.1(b)(9)(A) applies and the conduct supporting that enhancement "is the only conduct that forms the basis" for abuse of trust. The trust the victim placed in Marshall was as much personal as professional and the level of personal trust provides an independent basis to add two points under §3B1.3. Marshall went to great lengths to obtain the victim's personal trust, as a friend, by emphasizing loyalty and his willingness to protect the victim and his interests at all costs.

For example, in the letter where Marshall lied about how he acquired the prayer beads he sent the victim, he wrote: "I want you to know the person I am beyond being a 'stone cold killer' because there is more to me than meets the eye.

My loyalty is fierce to the point that if you called me right now and needed anything, I'd make it happen no matter the risks or stakes involved." Exhibit 6; PSR ¶ 17. Later, as Marshall and the victim continued to solidify their relationship, the victim told Marshall he was "looking forward to the next chapter of the life ride, with you right along next to me." Exhibit 9. Marshall replied: "Me too . . . couldn't have picked a better, more solid guy to make the next chapter of my life with." *Id.*

As the PSR notes, the victim installed Marshall as the CEO of Amyntor and, even before that entity was formally chartered, provided funding and unlimited oversight to Marshall to form the new company, demonstrating a significant level of trust separate and apart from Marshall's lies about the CIA-sponsored missions. PSR ¶¶ 24-25, 36-37, 43-44. In addition, Marshall was responsible for personal security for the victim and his family, which is a topic Marshall raised during his first email to the victim in January 2012. Exhibit 1.

Once installed as head of security, Marshall quickly learned about the victim's safety concerns and used those concerns to his full advantage in order to gain the victim's unwavering trust, which he used to facilitate the execution of his scheme to defraud. In 2016, Marshall used his Burner app to subscribe to a number with a 415 area code, knowing the victim was concerned about being stalked by a resident of that area. Exhibit 134. Marshall then sent himself a fake

10

text from that number, likely in the hopes of alarming the victim so he could remain in the role as trusted security advisor. Exhibit 134d. He did the same thing in 2017, using a 702 area code to send himself a message that he forwarded to the victim. Exhibit 134, 134f. During his subsequent discussion with the victim about the fake message, Marshall wrote: "I worry sometimes you think I'm compartmentalizing things away from you but it is ONLY to protect you, [victim's then-girlfriend], the kids and your family." Exhibit 134f at 1. Later, Marshall emphasized he was "just asking for trust and faith that I have your back all the way . . . ." *Id.*

Marshall's false representations that the fake missions were government-authorized certainly facilitated the fraud in this case, which is why the enhancement under §2B1.1(b)(9)(A) applies. But the significant level of trust the victim reposed in Marshall on a personal level, as a friend, and in relation to Marshall's role as the victim's head of security, is a different course of conduct that supports the application of the abuse of trust enhancement under §3B1.3. As the Ninth Circuit noted in *United States v. Christiansen*, 958 F.2d 285, 288 (9th Cir. 1992), a defendant must exploit the trust relationship to facilitate the offense. Marshall did that in this case by flaunting his alleged credentials and by forming a trusting personal bond with the victim, which assisted Marshall in executing the scheme to defraud. The friendship he fostered and the personal protection he

promised to provide support the application of the abuse of trust enhancement under §3B1.3.

## RECOMMENDATION

Section 3553(a) of Title 18 of the United States Code contains prefatory language: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Those purposes include the need for the sentence to:

- reflect the seriousness of the offense;
- promote respect for the law;
- provide just punishment for the offense;
- afford adequate deterrence to criminal conduct;
- protect the public from further crimes of the defendant; and,
- provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In addition, subsection (1) of § 3553(a) requires the Court to consider the nature and circumstances of the offense and the history and characteristics of the defendant; subsection (3) requires the Court to consider the kinds of sentences available; subsections (4), (5), and (6) require the Court to consider the sentencing guidelines and policy statements, and to avoid unwarranted sentencing disparity; and subsection (7) requires the Court to provide restitution to victims.

In this case, the application of the factors in 18 U.S.C. § 3553(a), including Marshall's history and characteristics, the seriousness of the offense, and the needs for specific and general deterrence, just punishment, to promote a respect for the law and to protect the public, supports the imposition of a sentence of incarceration at the high end of the advisory range, which the government believes should be 87 months.

Marshall's lack of respect for the law, which dovetails with several other 3553(a) factors, is deeply concerning. While he has no scoreable criminal history, he was convicted of public intoxication and disorderly conduct in 2010 after he refused to cooperate with law enforcement and demonstrated an "abusive attitude." PSR ¶ 98. He also obtained and distributed steroids from at least 2012 to 2015, as evidenced by text messages he exchanged with two different individuals during that time, in which they discuss terms like "deca" (Deca Durabolin), "sus" (Sustanon), "test" (testosterone), "test cyp" (Testosterone cypionate), Andadrol, and Anavar. PSR ¶ 101; Exhibits 336 and 337.

In this case, Marshall's lack of respect for the law goes way beyond the analysis of scored and unscored criminal history. The following facts, among many others, illustrate Marshall's disregard for the law, law enforcement, and the truth in general:

- The Court is well aware of the elaborate lies Marshall told about serving as a Force Recon Marine, including claims he was awarded both a Silver Star

13

and a Bronze Star, which he now acknowledges were entirely false. PSR ¶ 120. It is not clear whether he intends to cling to the lies about working for the CIA, though the record is replete with evidence, much of it outlined above, that he was never associated with that agency in any capacity.

- Marshall lied to the Indiana State Police in order to get hired in 1996, neglecting to disclose he had resigned from the police department in Marion, Indiana because he was the suspect in a residential burglary. Exhibit 116 at 4. He lied again in 1998 when he parlayed his fake military service into a coveted position on the state police Emergency Response Team. *Id.* at 3. Marshall resigned from the Indiana State Police when his duplicity was discovered. *Id.* at 5.

- Marshall petitioned for bankruptcy in 2003. PSR ¶ 126. On his Schedule I, signed under penalty of perjury, Marshall lied about his dependents. He claimed Chris Wernick as his son when, in reality, Wernick is Marshall's nephew. Exhibit 117 at 22.

- In November 2018, after the victim dissolved Amyntor and multiple people were challenging his credentials, Marshall, using another Protonmail account, sent an ominous email to the victim. Exhibit 140; PSR ¶ 56. That message, sent from Aliceinwonderland63@protonmail.com, was originally attributed to someone else. But during the search of Marshall's residence in December 2018, a printed list was seized that included passwords for several of Marshall's Protonmail accounts, including Aliceinwonderland63. Exhibit 140a. The victim was alarmed and unnerved by Marshall's statement about unleashing "death and destruction" on the victim's world as well as his warning that "you can't help yourself and your evil queen will rot with you." Exhibit 140.

Marshall's lack of respect for the law is further exemplified by his efforts to manipulate law enforcement officers. He sidled up to the police chief in Whitefish, cultivating a friendship that he later used to his benefit whenever possible. He expressed a willingness to let the chief "fix" a speeding ticket for one of Marshall's friends, even saying, "If you drop it I will owe you a cold beer."

Exhibit 309 at 7. On another occasion, Marshall asked the chief for an opportunity to "chat" with the suspect of a crime and "encourage him to relocate out of Whitefish." Exhibit 310 at 2. The chief responded: "That can be arranged, recording off of course[,]" and Marshall agreed: "Of course. Technical malfunction." *Id.* at 1.

As it relates specifically to this case, and to Marshall's attempts to undermine the victim's credibility at any cost, Marshall worked with the chief to set up another officer for alleged bribery for accepting the victim's invitation to participate in a guided hunting trip outside Montana. Exhibit 316. Marshall and the chief exchanged strategic text messages over the course of two months and the officer they targeted eventually resigned. *Id.* at 1. Before the resignation, however, Marshall texted the chief that he was worried "if you spill the beans to [officer] before the hunting trip he won't go. For what it's worth I'd slow roll it a bit and not do anything to spook him before the trip." *Id.* at 12. Later, Marshall asked the chief: "Are you going to give me a break and take a deep breath and let [officer] go on this trip Friday? I'd offer you a year of free golf but that might be bribery. If you let him go that's going to help the overall cause." *Id.* at 8. The "overall cause" was to denigrate the victim from multiple angles in the hopes Marshall's fraudulent conduct went uninvestigated.

Marshall's willingness to capitalize on a relationship with the head of a law

enforcement agency in order to exact revenge against the victim – and end another officer's career in the process – is an astounding example of his lack of respect for the law.

A thorough review of the record in this case reveals that, in some respects, Marshall's fraud scheme followed a familiar course. He befriended the victim, made material misstatements, and convinced the victim to part with money that Marshall used to fund a lavish lifestyle he otherwise never could have afforded. In a litany of other ways, however, Marshall broke the mold. The lengths he was willing to go to execute and cover up his scheme are nothing short of remarkable. His level of manipulation of those around him, including intelligent and accomplished individuals, highlights the seriousness of his offense and the danger he poses to the community.

Rather than attempt to fade into obscurity when the walls closed in, Marshall went on offense, engaging in a scorched-earth assault on the victim's credibility, as well as anyone else who dared to step in his way. He had no qualms about ending people's careers, forging documents, acquiring fake phone numbers and email accounts to send manufactured messages, lying about his background and his mentors or filing false reports with law enforcement agencies if his goals could be achieved and his needs met. There was no end to the falsehoods Marshall told to extract what he wanted and only when confronted with a mountain of irrefutable

evidence did he cede any ground. His conduct ranges far beyond the traditional pattern of obtaining money by making material misstatements. Marshall's crimes are indicative of a person in need of specific deterrence, just punishment, and a term of imprisonment sufficient to protect the public from the further offenses he seems certain to commit.

## CONCLUSION

For the reasons outlined above, the United States recommends a sentence of imprisonment of 87 months, followed by three years of supervised release. The government also recommends restitution in the amount of $3,254,327, and special assessments of $300.

DATED this 25th day of February, 2022.

> LEIF M. JOHNSON
> United States Attorney
>
> */s/ Timothy J. Racicot*
> Assistant U.S. Attorney
> Attorney for Plaintiff
>
> */s/ Ryan G. Weldon*
> Assistant U.S. Attorney
> Attorney for Plaintiff

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule, this certifies that the body of the attached response contains approximately 3,816 words, excluding the caption, certificate of compliance, and certificate of service.

LEIF M. JOHNSON
United States Attorney


*/s/ Timothy J. Racicot*
Assistant U.S. Attorney
Attorney for Plaintiff


*/s/ Ryan G. Weldon*
Assistant U.S. Attorney
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2022, a copy of the foregoing document was served on the following persons by the following means:

(1,2) CM/ECF
( ) Hand Delivery
( ) U.S. Mail
( ) Overnight Delivery Service
( ) Fax
( ) E-Mail

1. Clerk, U.S. District Court

2. Justin K. Gelfand
   7700 Bonhomme Ave., Ste. 750
   St. Louis, MO 63105
   (314) 390-0234
   justin@margulisgelfand.com

/s/ Timothy J. Racicot
Assistant U.S. Attorney
Attorney for Plaintiff

/s/ Ryan G. Weldon
Assistant U.S. Attorney
Attorney for Plaintiff